I'm sorry. Is it Mr. Pearson? Mr. Pearson? Mr. Pearson. Yes, yes, of course. Sorry. Please the court. My name is Matthew Pearson. I represent the Appellant Advanced Indicators in Manufacturing. This case arises out of two rulings from the trial court. The first one is the refusal to or the denial of the motion to remand. The other three points on appeal relate to the trial court's granting of summary judgment in favor of the Appellee Acadia Insurance Company. This case is a first party insurance case arising out of damage to my client's office and manufacturing facility as a result of Hurricane Harvey in August of 2017. Turning to the first point, refusal to or the denial of the motion to remand, the significant facts are that my client sued their insurance company for breach of contract and also sued the insurance company for extra contractual claims as well as the independent adjuster that was hired to investigate the claim on behalf of the insurance company. Those extra contractual claims were pursued pursuant to the Texas Insurance Code as well as the common law. A suit was filed in August 7th of 2018 and significantly after suit was filed about 23 days later, the carrier through their counsel submitted a notice pursuant to Texas Insurance Code Chapter 542A that they were accepting responsibility for the independent adjuster. So after time of filing? After time of filing. I think we know the facts, so we've got a lot of district courts that are interpreting Hoyt differently. Yes. Is that the sort of nub of this issue? That is the central point of this issue. There are a number of courts, as you've identified, that have gone both ways, but we think the court should be following in this fact pattern, the Shenaberry v. Allstate Court out of the Southern District of Texas. Specifically, that case is exactly on point. It also involves damage from Hurricane Harvey. I looked at those cases. Most of them, eventually, whether in footnotes or late in the analysis, they're saying Hoyt was wrong. They do, or they distinguish Hoyt. Well, but they distinguish, and eventually they seem to come—correct me if I'm wrong— they seem to say, you know, Hoyt misread precedent. The time of filing rule is crystal clear. You can't wait until summer judgment. I believe that's correct. And that's the argument you're making? That's a similar argument that we're making. And again, the Hoyt case doesn't deal specifically with Chapter 542. True, but the rule of law is we can wait and find out if there's a cause of action against a nondiverse defendant past time of joinder and filing. That's what it seems to stand for, I think. So the difficulty I have is Hoyt had to dissent. It's a complicated case. District courts have had time. Most of them are ultimately, I think, saying it's just wrong, and we don't have the liberty to do that. Well, and again, I think there is a distinction in the fact that Hoyt does not address 542A because you have to look at the words in the statute. Specifically, the statute makes a distinction between someone that elects responsibility before a lawsuit is filed and someone that elects responsibility after the lawsuit is filed. Counsel, you believe your removal—or I should say your motion to remand in this case is governed more by flag versus striker, but that seems to suggest that the case belonged in federal court, though, doesn't it? Again, I go back and follow the reasoning in the Scheneveri case, Scheneveri versus Allstate, and you have to look at the timing of the election. Right, but maybe just because you're in our court, stick with our case law, right? Flag's an en banc decision by our court. That Scheneveri case is a district court, and they're skirmishing. Well, what—do you have a case from our court, which does seem in the improper joinder context to do what Judge Engelhardt mentioned? I mean, the quote from Flag that seems dispositive is, to determine whether a plaintiff has improperly joined a nondiverse defendant, the district court must examine the plaintiff's possibility of recovery against that defendant at the time of removal. Well, at the time of removal, Your Honor, again, they had elected it, but the individual defendant is still a party to the case. There had been no motion to dismiss file and no order from the court at the time of removal. Isn't your complaint that the defendant made the case removable by asserting under the Texas Insurance Code the responsibility for the co-defendant, for the local defendant? Isn't that the legal gripe that you have about how the case became removable, that it was the defendant rather than the plaintiff that caused the diversity? That's true. Not only after the 61 days that they had proper notice in which they could have elected, but after the lawsuit and then just one day before they filed their notice. I mean, as I understand, it wasn't even a court ruling in state court. It wasn't even a dismissal that was entered. It was an assertion of an acceptance of liability under the Texas Insurance Code. That's exactly right. On August 30th, they filed their notice that they were accepting responsibility, and without getting any ruling from the state court, they filed their notice of removal the next day. And so that runs contrary to the voluntary-involuntary rule, which I think is still good law that you're arguing here. It seems to be still good law in the Fifth Circuit, Your Honor. And there is no order, and any order that would be in place would be an involuntary order, not a voluntary order. But I guess the argument which does sort of narrow it maybe to our circuit, in Texas cases, this 542 is irreversible. That election doesn't—I mean, there's nothing a district court could do. There could be no cause of action against Warren as of their assertion, right? The statute says that if they elect, and then they could file, and the court must grant a motion to dismiss. You're correct. So it's as if there's—isn't it—it's as if you've settled as to one defendant. There's no way Warren's on the hook. There's diversity. True. But again, Your Honor, the statute under Section 542A.006 makes a distinction about when that election is made. A notice is required before filing suit. You cannot file suit for 61 days. Therefore, the insurance company has 61 days in order to make that election. If they do, the statute says there is no cause of action against the individual defendant. However, the statute makes the distinction that if it is not made within the 61 days or before the lawsuit is filed, then the remedy is still a motion to dismiss, but the statute doesn't say that there is no cause of action that exists against that individual defendant. So there is a distinction, and that's why we believe the cases that follow that, you have to look at when they made their election. They did within 61 days after notice. So you aren't arguing to us a bright-line time of filing. You're arguing a very specific comply with 542A.00, which still could be an improper joinder after time of filing. It's just they delayed even longer. Is that the argument here? That's correct, Your Honor, under the express language of the statute. Okay, go ahead. So we believe that the proper cases, again, are the Scheneverry v. Allstate cases, and under the direct facts in this case that the notice accepting responsibility was made after the lawsuit was filed, more than 61 days after the notice letter was sent, and specifically one day before they removed the case, leads to the conclusion that the denial of the motion to remand was improper and this case should be sent back to the Harris County District Courts. If you turn to the second, third, and fourth points of appeal, which is the granting of the summary judgment, we believe that there was sufficient evidence to raise fact issues on both the breach of contract as well as extra-contractual claims and that the case should be reversed and remanded and sent back to the trial court. Specifically, the first issue that the court determined in granting summary judgment is it ruled that two critical declarations were unsworn, and based on them being the court's erroneous conclusion that they were unsworn, it eliminated them from the summary judgment record. On the clear face of those declarations, they were sworn. They follow the federal rules by stating under penalty of perjury that they are true and correct. But the district court does loop back and say, certainly with Dillamora, even if it were acceptable, Dillamora conceded there were pre-existing condition problems, at least in the deposition, not the declaration, right? In the deposition, you're correct, Your Honor. But again, there's a distinction between pre-existing condition of wear and tear. Again, this is an older roof. Any roof, any property that is more than six months old is going to have some level of wear and tear. The testimony that the court looked at in the deposition was only select. Mr. Dillamora recognized as any older building there is some level of wear and tear, but he made a specific distinction. Based on his investigation, he determined because of the multiple openings created by the damaging winds and rain from Hurricane Harvey that it totally overwhelmed the roofing system, caused it to fail, and thereby justified replacement of it under the policy. Skipping past the declarations, what is just the single best record site you've got that Harvey was the sole cause? The declaration is clearly the best evidence that Dillamora's testimony, both his deposition testimony as well as his declaration, established multiple pathways for which the water got in directly related to Hurricane Harvey. So we believe the testimony from his deposition, which we cite in our reply brief, as well as his declaration, established that the damage to the building, although there may be preexisting damage from wear and tear, is de minimis. The damage that caused this roof to fail that justifies the replacement of the roof was solely as a result of Hurricane Harvey. You've got an issue of fact. Yes, absolutely an issue of fact. And even if you get beyond that, you need to look at some other evidence that the trial court just ignored. And there are a number of things. Number one, there is evidence. The denial of the claim during the claims process was based on basically a report of damage from 2015 that the insurance company determined was not covered under the policy. And so when 2017 rolled around, the adjuster looked at those photographs that showed damage from 2015 and sent them to the independent adjuster. But what the insurance company ignored and the trial court ignored is that there was a declaration from the owner of Advanced Indicators, Mr. Karani, who testified and provided supporting information that after those leaks were reported in 2015, he made necessary repairs to the roof. He added screws. He caulked all the openings and actually added a coating over the top of the roof so that all damage from 2015 had been repaired. The court ignored that evidence. In addition to that, Your Honor, we had evidence from my client's public adjuster. He's the only person in this case that has personal knowledge of the condition of the building in 2015 and the condition of the building in 2017 because he was working with my client under both losses. And he testified about the minimal damage from 2015 being distinct from the massive damage from 2017, also coupled with the fact that the minor leaks from 2015 had all been repaired, the roof had been made airtight, and therefore all damage from 2015 had been repaired. But what's most significant— I thought that your expert said that on cross-examination that there may be minimal damage that had occurred before and had not been repaired and was not caused by the hurricane. Now, does that place on him, when he admits that there's minimal damage, the obligation to segregate that particular damage from the damage that was caused by a hurricane? If that particular damage caused the need for the replacement of the roof, yes. But in this case, he talked about minimal wear and tear of an older roof. Again, there is going to be wear and tear on any roof that is more than six months old. In this particular case, this is several years old. But that wear and tear, which he acknowledged, which he should acknowledge, which made him credible, did not cause the failure of this roof. The failure of the roof was caused solely by Hurricane Harvey. But that was made clear by his testimony. I mean, he was not claiming any pre-existing damage before the hurricane. Is that what you're telling me?  He is saying that there was no damage that justified the replacement of the roof. The replacement of the roof was caused solely by Hurricane Harvey. Is that the only admission that the expert made with respect to pre-existing damage? He recognized that there was some pre-existing damage in the form of wear and tear. In the form of what? In the form of wear and tear. But significantly— Did he try to articulate that particular wear and tear as separate from the damage that was caused by the hurricane? He did. And again, Your Honor, his conclusion was that as a result of the multiple openings to the roof system from Hurricane Harvey, the roof needs to be replaced solely because of that damage, despite the fact that there may be some wear and tear. In other words, the wear and tear didn't cause this roof to fail. Hurricane Harvey did. And that is the only admission that he made with respect to pre-existing damage? Yes, the wear and tear. The other thing that's significant that the— Is that the only evidence that the defendant came forward with, didn't come forward with any other evidence of pre-existing damage that should have been segregated? Again, they relied on photographs from 2015. But again, they failed to recognize that all of that damage from 2015 had been repaired and the roof had been made airtight. And significantly, they ignored their own underwriting file. For 17 years, they had insured this building and then inspected it on at least six occasions and determined it was airtight and suitable for wind and rain. Thank you, Counsel. You have rebuttal time. Let's see. Ms. Martin. Now, is it your position that if we review the record and we find that there is minimal but nevertheless plain and unequivocal pre-existing damage that was not segregated from the claim that was being made, does that obligate him to categorize or segregate that damage at the expense and loss of any coverage for the hurricane damage? I think the case law is clear both in this court and in the Texas courts under diversity jurisdiction. However minimal, it can bar his claim from significant legitimate damages. The case law uniformly says that it's the obligation of the insured as part of its burden of coverage to segregate non-covered losses from covered ones. But he's saying, well, he's saying two things, right? He's saying there's an issue of fact because your own underwriting reports are blessing this building and Ross is saying after 2015, it looked great. And then when I read the district court's summary judgment, it actually says Delamora said solely Harvey. And then he struck it because it wasn't signed, right? So dealing then first, Judge Higginson, with the underwriting issue, I think if the court goes back and looks at the entire record and the testimony of the underwriter, there isn't anything saying it's airtight. And the purpose of underwriting inspections is not to go through and ensure that there's no damage.  The insurance company doesn't need to assure itself that there's no wear and tear because the policy excludes wear and tear. It doesn't need to assure itself that there's no pre-existing damage because the policy would not cover loss for pre-existing damage. So the idea that the underwriting inspections make... Isn't it always the case? Let me back up a little bit. Is the submission of the claim when it's not a single source where there's just a pristine building that the hurricane comes and damages, is it always the case that a claimant, an insured, has to assign percentages? Or is it such that the insured submits a claim and has 26 items of damages and the adjuster comes in and says, well, these 20 are covered, but these other 6, for whatever reason, are pre-existing, maybe caused of damage for an uncovered peril, those we're not going to cover? Isn't that always the exercise in terms of filing claims and having them paid? Yes, Your Honor. In terms of making a claim, the procedure is that the insured makes a claim. Sometimes it's specific. Frequently it's not very specific. The insurance company and adjuster investigate the loss and then provide a decision explaining what part of the loss is covered and what, if any, part of the loss is not covered and the reasons why. But it just seems like your argument, and correct me if I'm wrong, it just seems like your argument is that if you submit a claim, if an insured submits a claim and doesn't parse out, I mean, I guess wishful thinking, they might submit a claim that includes something that's arguable, but if the insured does not parse those out, then the insurance company can simply say, well, if you're not going to do that, then we don't cover any of it. So, Your Honor, the difference is you're talking about during the claim handling process. What happens during the claim handling process is not the same thing that happens during litigation. So during the claim handling process, frankly, the insured's only burdens are to comply with its duty of cooperation under the policy. But the insured doesn't have an obligation during the claim handling to investigate its loss. Well, let's talk about in the litigation process, and specifically under Rule 56, isn't that part of the litigation process for the court to say these are disputed issues as to whether these items are covered or not covered, and that's what the trial is all about and the expert witnesses and so on? So, Your Honor, once we get into litigation, now the insured as the plaintiff has the burden of proof. That's the burden. That's the law. So at that point in time, it's not enough for the insured to be able to stand back and say, here's my claim. Now the insurance company has to disprove it. It has the burden under Rule 56 to show that there's a genuine dispute as to the claim, not proving up the claim itself, which, of course, it would have to do at trial, but at Rule 56 stage, it would have the burden of saying, well, we've got one expert that says it is caused by X and one expert that says it's caused by Y, so that's a triable claim or triable part of the claim that the insurer should cover. Right, but what this court has said is that in the Hamilton Properties v. American Insurance case, very clearly said it is the insured's burden where there is . . . Hamilton Properties actually was my case. I argued it, so I remember it really well. In Hamilton Properties, it was wear and tear, was what we had evidence of. We had evidence of wear and tear, and the plaintiff had an inability to segregate out the part of its loss that was caused by the wear and tear versus the part of its loss that was caused by hail. By the peril. Right, and this court's precedent is that the plaintiff carries that burden. And in this case, the plaintiff didn't even come close to meeting it. He talks about De La Mora, and what we objected to in an evidence was the fact that Mr. De La Mora's declaration testimony was conclusory. And it is. When you look at that declaration, it's very conclusion, conclusion, conclusion, conclusion. There is no substance there. And so that is no evidence at the summary judgment stage. He authenticated his report in that, but he did not swear to the contents of his report. This court has made very clear that an unsworn report is not evidence. That would be Provident versus . . . or Provident Life and Accident versus Goal, Fifth Circuit, 2001. An unsworn expert reports do not qualify as affidavits or otherwise admissible evidence for the purposes of Rule 56 and may be disregarded. So it was proper in this case to disregard Mr. De La Mora's declaration because it was conclusory, to disregard Mr. De La Mora's report because it was not proper summary judgment evidence. Have you gone through the claims that he's made and made in court and yourself segregated the non-covered from the covered? Well, did my experts try to segregate covered from non-covered? Right. We have not. That's not our burden. But I'm asking you whether you have. We have not. We have not. It is my role in representing the carrier to identify the causes of loss that are excluded. So that is the burden and I would encourage the court to look back . . . So if he says that it is covered,  so we have to accept everything that he said on face value. Is that right? For the purposes of this appeal. There is evidence of non-covered. We included testimony from our engineer, Jason Watson. If the court looks back at our motion for summary judgment, you'll even see photos comparing side-by-side items from the 2015 claim. I mean, that's essentially what I'm asking you is, I suppose it would take some articulation from the lawyers to explain what the experts were talking about as non-covered aspects of your experts. Did you do that? Yes, Your Honor. In our motion for summary judgment, it puts forth the evidence that we have of the fact that the damages are not covered. And is there any indication of the value of the non-covered asset or the difference between the amount that is being totally claimed and the amount of the non-covered? I mean, did you take any steps to try to prove your case, notwithstanding whose burden it was, to establish that the claim was not covered? We actually do not believe there is any covered loss to this building. So I would not have had my experts value that. This building is the only claim that is at issue here? Yes, Your Honor. But your summary judgment motion, of course, that is what you said. There's no damage from Harvey. But then they say there's a fair inference there is because your underwriting report said they completed all necessary repairs. Issue of fact. Then the district court says, in fact, Delamora said it was solely from Harvey. Issue of fact unless we can't consider it, right? If Delamora's testimony— Not if. The district court said. He didn't, the district court, in its order, right before it struck it, say he said it was solely from Harvey, the damage. Do you remember that word he said? Yes, and he, I will tell you, in his declaration he says, in a flat-out conclusory manner, all the damage is caused by Harvey. But the district court properly struck it because it's conclusory and therefore not summary judgment evidence and it's contradictory of his deposition testimony. So it is not viable summary judgment evidence. And why is it conclusory? I mean, I don't really see, I mean, if you claim that it's all covered and that's the issue of whether it is or is not covered, why is it conclusory? I mean, what obligation has he got to itemize everything? Your Honor, it's conclusory because imagine if we were trying the case and all that happened was Mr. Delamora got up on the stand and said, I've looked at everything and in my opinion, all the damage is caused by Hurricane Harvey. That's absolutely conclusory and not admissible evidence. He has to provide a foundation for his opinions. I don't know about that. He says, I've looked at their own underwriting reports and they said they fixed everything. We agree that they fixed everything. In fact, Mr. Ross says they fixed everything. That doesn't sound conclusory. There's a foundation for an expert opinion. Mr. Delamora doesn't in his declaration say I looked at the underwriting reports. You're hypothesizing that if he were to get to trial, he'd have no foundation. First of all, Mr. Delamora did not look at the underwriting reports to reach that conclusion. But secondly, I'm sorry? Oh, okay. I thought I heard a question. I think we have your point. The other issue is a significant one. It's much more legal. Do you want to address his arguments on the weight question? Yes, I do, Your Honor. So part of the problem is that the courts have waded into what Judge Alvarez has called the thicket of jurisprudence that's the voluntary-involuntary rule and that it's notoriously opaque. And I think the problem is we're getting caught up on the voluntary-involuntary rule when this court has very clearly said improper joinder is an exception to the voluntary-involuntary rule. Can the defendant create the improper joinder? Yes. I think the defendant can create the improper joinder because the purpose of the voluntary-involuntary rule is to prevent the idea that we have diversity created but the plaintiff could still appeal that resolution of the nondiverse defendant. And so sometime in the future, there could be a reversal and now all of a sudden there's no diversity. If we agree with you with regard to the removal, what of the voluntary-involuntary rule, what is left of it? Can you describe a circumstance that it might still be something that can be followed? It would be in a situation where there wasn't improper joinder. But it was not improper joinder, you said. Right. Where you couldn't prove improper joinder. So I'll give you an example that what if the rule in 542A06 was different than it is? What if it was revocable? So what if an insurance company would say, we accept the liability until we take his deposition and then if he says something that exposes us, we're going to withdraw that. Then it wouldn't be subject to improper joinder and it would be a problem for voluntary-involuntary because that defendant could come back into the case and destroy diversity. But in this case, as Judge Higginson noted, it's not appealable. It's final. Once the election is made, there isn't, you know, no take-backs. So there isn't the issue that we normally have that implicates the voluntary-involuntary rule. And therefore, what we should be looking at is improper joinder and then really what the courts who come out on the other side of this, the language they play with is that they say, well, despite the fact that every Fifth Circuit case you look at says we consider jurisdictional facts at the time of removal, they want to say, but we're looking at joinder, so we're going to look at the time of removal. When you say every case, you didn't cite in your brief at all Flagg. So what's the case you're relying on? So I would say Flagg. But you didn't cite it to us. It's not even in your brief. So every case, just give me one other published case from our court. Another published case from our court is actually a very recent one from the Fifth Circuit, November 30th, 2021, Williams v. Homeland Insurance Company, whether the plaintiff had any possibility of recovery against a non-diverse defendant in state court at the time of removal. Was that cited in your brief? No, because that was just last week. So it's a new case. Right, but you're supposed to send those to us so your opposing counsel can see it. I assume you weren't relying on Flagg because you don't cite it and you say every case has made this statement of law, but your only second authority is one that you also didn't cite and you didn't 28J it. If it's every case, do you have any case that you cited that says that we confirmed diversity jurisdiction at the time of removal, not at the time of filing? Any case that you cited? Not in front of me, Your Honor. I think that's, to me, the source of why the district court may be wrong. Do you have any other circuit or any scholar saying that the defendant can eliminate diversity after the lawsuit was filed? Any other circuit or scholar saying that? After? I feel like there is, but it does not come to mind at this point, Your Honor. I think it would be in your advantage, if you do come up with that, to furnish us the names of the cases or the style of the cases that you claim to support that proposition. I'm not being too heavy-handed. Flagg's an en banc opinion, and you've heard me read it to counsel. It says that. And he, of course, I think today, wasn't relying on this bright-line time of filing. Instead, he's saying, well, 542 elections by a defendant could create an improper joinder. I think he'll correct me in rebuttal if I'm misstating it. But here, your client didn't make that election in time. Well, and so that is a misrepresentation of what 542A says. 542A doesn't impose a time limit on when we can make the election. We can make the election at any point in time. But 542A does require that they give notice at least 60 days before filing suit. In this case, though, the record is clear that they actually did not do that. That's the other thing I would like the court to look at in this, is they did send us a demand letter more than 60 days before. But in that demand letter, there was no mention of any statutory violation. There was no mention of Nicholas Warren, the adjuster who they are now pointing to as the first defendant. So there was nothing to put Acadia on notice that they needed to make an election until the lawsuit was filed. And so this court put a Professor Wright in the Smallwood case saying federal courts should not sanction devices intended to prevent removal to a federal court where one has a right and should be equally vigilant to protect the right to proceed in the federal court as to permit the state courts in proper cases to retain their jurisdiction. And Judge Dawley went on to say in his defense, it's reasonable and fair to assume that a lawyer acting in accordance with the Code of Professional Responsibility will not sue someone against whom he has no reasonable basis of recovery unless it's for an improper reason. What happened in this case is they filed suit without having given us notice and that this court allows that to stand . . . this idea that it's at the time of removal, then defendants will have no recourse. How soon after the suit did you make the election? Within 30 days. I mean, we . . . I'd have to look back at the timeline, but it was within 30 days because it was . . . In fact, it was, if I had to guess, close to 21 days because our office routinely files a removal on the day that the state court answer would be due. So, but I can say for sure before 30 days of receiving the suit. There is . . . if this court says that failing to make the election before suit is filed prevents removal, then that just encourages folks in the plaintiff's position to not send notice letters. There's no penalty for them in not sending it. The mechanism in state court is that there's a stay of the case during which time the defendant gets the option to elect responsibility, which, in effect, is what happened here. I'm out of time. Thank you. I would like to address that last point first, if I may, in that there was a proper notice sent in this particular case. As I recited, it was sent in May of 2018, and in response to that notice, if they felt that it was insufficient, they could have raised a dispute to that and could have filed a motion to abate. They didn't. Instead, what they asked during that time period is for a re-inspection. But what they didn't do is they didn't elect responsibility for the individual adjuster during that 61-day period or before the lawsuit was filed. What is your rule of law? Removal was improper because of what and when? The removal was improper pursuant to Chapter 542A because the election was not made before the lawsuit was filed, and the statute makes a specific distinction. If the election is made before the lawsuit is filed, then there is never a cause of action against the individual adjuster. However, you're relying on 542. You're not pushing against Hoyt, which is arguably authority in line with Flatt. I am focusing primarily on the expressed language in the statute, specifically Chapter 542A.006, subsections B and C. Turning to the other issues that you addressed, counsel, about the – you had referred to the opinion, and you were correct, that the trial judge did specifically recognize that the affidavit or the declaration by Peter De La Mora did establish that the damage was solely caused by Hurricane Harvey, but he struck it as being unsworn. Then like four pages later, he sort of backtracks though, right? He says at best and at worst. If you look at the deposition, it actually doesn't say that. Right. Is he creating an issue of fact just between the two items of evidence that De La Mora had? I don't think he's creating an issue of fact. He's pointing out different testimony from the deposition versus the declaration, but not an issue of fact. The thing that I think is important here is it's distinguished between the segregation between covered perils. Where we normally see this issue is where we have competing perils that cause damage to a building, for example, wind, which is generally covered under policy, and flood, which is generally excluded. That's when you have competing causes and you have to segregate it. Wear and tear is not a sudden and accidental event. It is not a peril. It is something that's a condition of property that exists over time, and that's what we have in this bouquet. We don't have competing perils that we have to segregate. We have some wear and tear on an older building that we have to recognize. Not recognizing would make it incredible, but yet we recognize that there is some wear and tear, but it's de minimis. What we also recognize is that when Hurricane Harvey came through, it created massive damage to this building and created a series of openings in the building that allowed water to get in and destroy this roof, and that the damage was caused solely by Harvey, despite the fact that this building, as well as all buildings, contains wear and tear. And to her argument that the declaration is conclusory, I dispute that. If you go through it, he talks about this investigation that he made, interviewing the property owner, his visual observations, taking photographs, and reviewing weather data. And then he outlined specifically that there are storm-created openings, and he just doesn't say conclusory, hey, I found storm-created openings. No, he says there were storm-created openings. Gutters and fascia was blown off. There were separated roof panels from the wind. Screws were pulled out, which allowed the panels to move, which allowed water to get in. There was seam separation, and there was counter flashing that was blown off. And those are the openings in the roof caused by Hurricane Harvey that allowed the water to get in. And then he further goes on to say that I value— You have an explanation of the Times running out. The 2001 case of ours that says it's got to be sworn. The declaration is sworn. It's unequivocal. It says, I declare under penalty of perjury that the foregoing is true and correct. And so, yes, he does attach his report as background information, but the substance of his opinions are included within the actual declaration, which is sworn to under the rules. And he further goes on to say, I also evaluated other potential causes of damage, such as wear and tear, lack of maintenance, faulty or defective construction or repair, rust and corrosion, and continuous and ongoing leakage and seepage. And I did not find any of those causes for the water damage to the property. So he identified the damages under the policy from Hurricane Harvey that caused the roof failure, and he did evaluate other causes and determined that they were not related to the failure of this roof. Unless you have any other questions, I'll give back my five seconds. Thank you, Counsel. Thank you.